[853 NYS2d 821]

In the Matter of MONROE COUNTY PUBLIC SCHOOL DISTRICTS, Namely BRIGHTON CENTRAL SCHOOL DISTRICT, et al., Appellants, v WAYNE E. ZYRA, as President of MONROE COUNTY LEGISLATURE, et al., Respondents.

Fourth Department, March 21, 2008

## APPEARANCES OF COUNSEL

*Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C.*, East Syracuse (*Joseph G. Shields* of counsel), for petitioners-plaintiffs-appellants.

*Daniel M. DeLaus, Jr., County Attorney*, Rochester (*Michael E. Davis* of counsel), for respondents-defendants-respondents.

*Simpson Thacher & Bartlett LLP*, New York City (*Joseph F. Wayland* of counsel), for the Campaign for Fiscal Equity, amicus curiae.

## OPINION OF THE COURT

HURLBUTT, J.P.

The issue before us on appeal in this hybrid CPLR article 78 proceeding/declaratory judgment action is whether the exercise by respondent-defendant Monroe County (County) of what is known as the "sales tax intercept option" offered by Laws of 2005 (ch 58, part C) allows the County to reduce its statutory sales tax sharing obligation to petitioners-plaintiffs, school districts outside the City of Rochester (School Districts), to their proportionate share of the monies received by the County after deduction of the amount intercepted by the State to pay the County's Medicaid obligation. We agree with the School Districts that no such reduction is authorized and that the judgment should therefore be modified accordingly.

### Background

By way of background, we address first the County's Medicaid obligation. Under the Social Services Law, counties are responsible for the provision of payment for "[m]edical assistance for needy persons" (Social Services Law § 363), commonly referred to as Medicaid, and they also are subject to reimbursement from the federal and state governments (*see* Social Services Law § 368-a). Over the past several years, the costs of Medicaid services have risen precipitously; indeed, according to the affidavit

of a county budget official, the County's Medicaid costs rose from $80.3 million in 1995 to $155.2 million in 2005. In an effort to ease the burden of those rising costs on the counties, the State Legislature enacted Laws of 2005 (ch 58, part C), which provides for a sequential "cap" on the increase in the counties' respective shares of Medicaid expenses. From the base year of 2005, the Medicaid expense of each county is limited to its 2005 expense, plus an additional 3.5% in 2006, an additional 3.25% in 2007, and an additional 3% in 2008 and each year thereafter (L 2005, ch 58, part C, § 1 [a]-[d]). This "expenditure cap amount" must be paid by the counties to the State in equal weekly payments (§ 1 [f]).

Section 2 of the enactment affords counties the option of limiting their Medicaid costs via the sales tax intercept (*see* L 2005, ch 58, part C, § 2 [b]; Tax Law § 1261 [f]), and Monroe County has chosen to exercise that option. Thus, instead of a capped rate of increase in its Medicaid expenses, the County will satisfy its Medicaid obligation by the intercept and transfer by the State Tax Commissioner to the State Comptroller of a percentage of the County's sales tax revenues. That percentage, denominated the Medicaid factor (*see* Tax Law § 1261 [f] [2]), is determined by calculating the County's sales tax base for state fiscal year 2006-2007, and by then dividing the County's 2006-2007 expenditure cap amount under Laws of 2005 (ch 58, part C, § 1) by the amount of the sales tax base (*see* Tax Law § 1261 [f] [2] [A]). The State Tax Department's calculation of the County's Medicaid factor is 0.0161, or 1.61%. Each month, the State Tax Department calculates the sales tax base based on the sales tax payment owed to the County by the State and multiplies that amount by the Medicaid factor of 1.61%. The resulting sum, described in section 1261 (f) (4) as the monthly Medicaid amount, is then subtracted from the amount of sales tax owed to the County pursuant to section 1261 (c) and is paid into the general fund of the state treasury (*see* § 1261 [f]).

We next address the sales tax allocations for the counties. County sales tax collection and distributions are governed by article 29 of the Tax Law, which was enacted in 1965. All such sales taxes are collected by the State Tax Commission (*see* Tax Law § 1250). After deducting amounts necessary for refunds and for the costs of administering, collecting and distributing such taxes, the State Tax Commission makes monthly remittances to the counties of the taxes, penalties and interest imposed by them (§ 1261 [b], [c]). The Tax Law authorizes coun-

ties to share their sales tax proceeds with cities, towns, villages, and school districts (*see* Tax Law §§ 1262, 1262-a—1262-s), and Monroe County has done so for many years. Separate agreements, codified in sections 1210 (25), 1262, and 1262-g of the Tax Law, mandate the allocation of sales tax proceeds according to what is undisputedly a complex formula. In 2006, the distribution was as follows:

| | |
|---|---|
| County | 31.34% |
| City of Rochester (City) | 31.34% |
| Towns | 20.68% |
| Villages | 2.24% |
| School Districts (outside City) | 14.4% |
| TOTAL | 100% |

According to the 2008 county budget, estimated 2007 distributions were as follows:

| | |
|---|---|
| County | $123.5 million |
| City of Rochester | 123.5 million |
| Towns | 81.9 million |
| Villages | 8.8 million |
| School Districts (outside City) | 56.8 million |
| TOTAL | $394.5 million |

The County has estimated taxable sales in 2008 of $10.06 billion, which at the county sales tax rate of 4% would yield $402.4 million in sales tax proceeds. Under the County's interpretation of the sales tax intercept legislation, however, the County's budgeted sales tax revenue is reduced by the Medicaid factor of 1.61% of sales, or approximately $162 million, leaving 2.39% of sales, or approximately $240.4 million. Application of the respective statutory percentages to that sum results in approximate sales tax allocations of:

| | |
|---|---|
| County | $ 82.9 million |
| City of Rochester | 82.9 million |
| Towns | 40.3 million |
| Villages | 4.8 million |
| School Districts (outside City) | 29.5 million |
| TOTAL | $240.4 million |

In order to hold the City, towns and villages harmless from the reduced sharing amounts, the County has entered into intermunicipal agreements guaranteeing the municipalities the

same dollar amount of sales tax revenue had the intercept option not been elected. No such agreement was made with respect to the School Districts, however. The result, according to the School Districts, is an aggregate shortfall of approximately $29 million.

### Procedural History

In May 2006, the County commenced an action seeking a judgment declaring that, should it select the Medicaid intercept option, its statutory sharing obligation would apply only to the sales tax proceeds received by the County after the deduction for the intercept. Supreme Court granted the relief sought, but we reversed the judgment and dismissed the complaint on the ground that it sought an advisory opinion, and thus the court lacked subject matter jurisdiction (*County of Monroe v City of Rochester*, 39 AD3d 1272 [2007]).

On September 26, 2007, the County Legislature passed the resolution required in order to adopt the Medicaid intercept option (*see* L 2005, ch 58, part C, § 2 [b] [i], [ii]). Various school districts in the County commenced this hybrid CPLR article 78 proceeding/declaratory judgment action approximately one month later, and the parties thereafter stipulated to an amended petition and complaint that, inter alia, added two school districts as petitioners-plaintiffs. The motion of the School Districts for a preliminary injunction was treated by the court as a motion for summary judgment, and respondents-defendants cross-moved for summary judgment. In granting the cross motion, the court agreed with the County concerning the interpretation of the effect of its exercise of the Medicaid intercept option and, inter alia, granted judgment declaring, in substance, that the County is required to allocate to the School Districts only their share of sales tax proceeds received by the County after the deduction for the intercept. Although we have applied most of the same rules of statutory construction applied by the court, we disagree with the court's statutory interpretation. Instead, we conclude that the sales tax sharing obligation of the County applies to all of its sales tax proceeds, without regard to the Medicaid intercept.

### Discussion

The issue before us is that of legislative intent, and its resolution hinges on the meaning of Tax Law § 1261 (f) (8), enacted by Laws of 2005 (ch 58, part C, § 7). Section 1261 (f) (8) provides that

"[n]othing in this subdivision shall be construed to relieve a county of any obligation or commitment to distribute and pay or allocate net collections pursuant to this part, regardless whether such obligation or commitment arises before or after the date this subdivision shall have taken effect, or to preclude a city in a county from exercising its prior rights under section [1224] of this article. To the extent that a county's net collections have been diminished below a level sufficient to meet any such obligation or commitment as a result of the reductions or bills provided for in this subdivision, such county shall hereby be authorized to use any other funds available to it to meet such obligation or commitment, notwithstanding any law to the contrary."

In resolving the parties' dispute concerning the meaning of Tax Law § 1261 (f) (8), we are mindful that our task is to "ascertain and give effect to the intention of the Legislature" (McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a]; *see Riley v County of Broome*, 95 NY2d 455, 463 [2000]). "The statutory text is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning" (*Matter of DaimlerChrysler Corp. v Spitzer*, 7 NY3d 653, 660 [2006]). Nevertheless, " 'inquiry must be made of the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history' " (*Mowczan v Bacon*, 92 NY2d 281, 285 [1998], quoting *Matter of Sutka v Conners*, 73 NY2d 395, 403 [1989]). Further, we must afford "the statute a sensible and practical over-all construction, which is consistent with and furthers its scheme and purpose and which harmonizes all its interlocking provisions" (*Matter of Long v Adirondack Park Agency*, 76 NY2d 416, 420 [1990]). Moreover, "it is well settled that courts should construe [a statute] to avoid objectionable, unreasonable or absurd consequences" (*Long v State of New York*, 7 NY3d 269, 273 [2006]), and also to avoid rendering any of its language superfluous (*see Matter of Branford House v Michetti*, 81 NY2d 681, 688 [1993]).

As previously noted, section 1261 (f) (8) provides that the selection of the intercept option does not "relieve a county of any obligation or commitment to distribute and pay or allocate net collections pursuant to this part." Importantly, the term "net collections" is defined in section 1262 (f) (1) as "[t]he moneys collected from a tax or taxes imposed pursuant to this

article, after deducting therefrom expenses of administration and collection and amounts refunded or to be refunded."

The first sentence of Tax Law § 1261 (f) (8) explicitly incorporates the statutory term "net collections," and we agree with the School Districts that, in view of the statutory definition of that term set forth in article 29 of the Tax Law, the County must continue to distribute to the School Districts their statutory share of the entire amount collected, less deductions for refunds and administration and collection expenses, and without regard to the reduction in such amount due to the sales tax intercept. We reject the contention of the County and the conclusion of the court that, by enacting the Medicaid intercept option and section 1261 (f) (8), the Legislature in effect redefined the term net collections to mean the amount of net collections remaining after the intercept, instead of what section 1262 (f) (1) explicitly says it means. Our conclusion is further supported by the principles that "[w]ords of technical or special meaning are construed according to their technical sense, in the absence of anything to indicate a contrary legislative intent" (Statutes § 233) and that, "[i]n the absence of anything in the statute indicating an intention to the contrary, where the same word or phrase is used in different parts of a statute, it will be presumed to be used in the same sense throughout" (Statutes § 236; see Riley, 95 NY2d at 466).

The County's interpretation of paragraph (8) of Tax Law § 1261 (f) is further belied, and the School Districts' interpretation further supported, by the second sentence of that paragraph. That sentence authorizes the County to use other available funds to meet its obligation or commitment "[t]o the extent that [its] net collections have been diminished below a level sufficient to meet any such obligation or commitment." Contrary to the County's contention, that sentence does not mean that only post-intercept funds need be distributed by the County and, contrary to the court's conclusion, it does not pertain only to lump sum, as opposed to percentage, shares of sales tax net collections. We conclude that the purpose of the second sentence in section 1261 (f) (8) is simply to authorize the County to use funds from other sources—not otherwise authorized for such use—to meet its sales tax distribution obligation or commitment as mandated by the first sentence of the paragraph.

As previously noted, the rules of statutory construction require that we avoid rendering statutory language superfluous (see Branford House, 81 NY2d at 687). Thus, our interpretation

of the statute is supported by the fact that, if we adopt the meaning of the first sentence of Tax Law § 1261 (f) (8) advanced by the County, i.e., that its only obligation is to share the amount of net collections remaining after the Medicaid intercept, there simply is no need for the second sentence of that paragraph, because that amount could never be less than the amount required to be distributed. Further, the court's interpretation of the second sentence as relating only to lump sum obligations is in no way suggested by the statute and, indeed, that interpretation would have the illogical and unreasonable consequence of guaranteeing the unabated payment of the limited and relatively small lump sum distributions of sales tax revenues, while allowing for the reduction of millions of dollars in percentage distributions.

We are satisfied that the School Districts' interpretation of Tax Law § 1261 (f) (8) is consonant with " 'the spirit and purpose of the legislation[, in view of its] statutory context . . . as well as its legislative history' " (*Mowczan*, 92 NY2d at 285). The manifest intention of Laws of 2005 (ch 58, part C) is to ease the effects of sharply rising Medicaid costs, by capping the annual increase in the obligations of counties for those costs from 2005 to 2007, and by then granting counties the option to continue the cap at 3% per year or to substitute a continuing contribution obligation in the same ratio to the sales tax base of a county as was its capped Medicaid contribution to that base in 2005. We discern nothing in the legislation reflecting the interpretation advanced by the County, which in effect would allow the County to shift a portion of its Medicaid obligation to the sharing municipalities and school districts. Here, the obligations thus shifted would, absent the intermunicipal agreements, amount to more than $100 million.

Finally, although there is little legislative history bearing on the issue before us, documents in the record establish that the Office of the State Comptroller and the State Department of Taxation and Finance also have interpreted Tax Law § 1261 (f) (8) as continuing the obligation of the County to allocate all of its sales tax proceeds, unaffected by the intercept. The State Comptroller's "2005-06 Budget Analysis" dated May 2005 (available at http://www.osc.state.ny.us/reports/budget/2005/enactedbudget051105.pdf) notes that the intercept is taken from the "county share only" of sales tax revenue (*id.* at 102) and, further, that there is no fiscal impact on local municipalities within counties or school districts (*see id.* at 102, 105). And the

Acting Commissioner of the New York State Department of Taxation and Finance (Acting Commissioner), in a letter to the Monroe County Executive dated April 30, 2007, wrote in relevant part that:

> "It is also important to note that choosing the sales tax option does not relieve a county of any obligation it has to share net collections from its sales and use taxes with localities in the county, such as cities, towns, villages or school districts . . . A county which elects the sales tax option must still allocate sales and use tax revenues to localities . . . as if it had not made the election. The Tax Law specifically provides that, if, after the monthly Medicaid intercept, the county does not have enough sales and use tax revenues remaining to make allocations to localities in the county . . . , then it is authorized to, and must, use revenues from other sources to make [those] allocations . . . ."

To be sure, the issue before us is one of pure statutory interpretation, "dependent only on accurate apprehension of legislative intent[. Thus,] there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]; *see Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal*, 5 NY3d 303, 312 [2005]). We nevertheless agree with the School Districts that the Acting Commissioner has correctly interpreted the statute.

### Conclusion

In sum, the plain language of Tax Law § 1261 (f) (8) and the legislative purpose, context, and history of the legislative enactment, as well as the administrative interpretation thereof, all lead to the conclusion that the County must continue to allocate to the School Districts their full statutory share of sales tax net collections, unaffected by the intercept. Accordingly, we conclude that the judgment should be modified, and judgment should be granted so declaring.

MARTOCHE, CENTRA, GREEN and GORSKI, JJ., concur.

It is hereby ordered that the judgment so appealed from is unanimously modified on the law by denying the cross motion

and vacating the declaration and by granting the motion in part and granting judgment in favor of petitioners-plaintiffs as follows:

It is adjudged and declared that respondent-defendant Monroe County is obligated to allocate to petitioners-plaintiffs their full statutory share of sales tax net collections, as defined in Tax Law § 1262 (f) (1), undiminished by the election of the sales tax intercept option and as modified the judgment is affirmed without costs.